## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CARLOS BYTHER, by and through his guardian ad litem, IRENE BYTHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 04-0404-CG-B** |
| | ) | |
| **CITY OF MOBILE, OFFICER SCOTT CONGLETON, OFFICER JOSEPH GOFF, OFFICER D. BROOKS, OFFICER NELSON BROWN, OFFICER B. HINES, and OFFICER ROBERT AMMAC** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendant, Scott Congleton, for summary

judgment (Doc. 90), the motion of defendants, the City of Mobile, D. Brooks, Joseph Goff, B.

Hines, and Robert Hammac[1], for summary judgment (Doc. 94), the motion of defendant, Nelson

Brown, for summary judgment (Doc. 96), plaintiff's responses to the motions for summary

judgment (Docs. 104, 110, 112), and defendants' replies (Docs. 117, 118, 121).  For the reasons

stated below, the court finds that summary judgment is due to be granted in favor of all

defendants on all claims.

## FACTS

This action arises from the events that took place during the capture and arrest of Carlos

---

[1] Officer Robert Hammac was originally identified in the complaint as Officer Robert Ammac.  Since both plaintiff and defendants refer to the officer as Robert Hammac in their more recent filings, there appears to be no dispute that the correct designation for the officer in question is Robert Hammac.

1

Byther on June 27, 2003. Byther himself claims to remember nothing about the morning of this incident; thus he sets forth no facts of what he did or what occurred on the morning of June 27, 2003. (Byther Depo. pp. 73, 87). At the time of the incident, Nelson Brown and Scott Congleton were police officers with the City of Mobile, Alabama. (Brown Depo. p. 13, Congleton Depo. p. 12). During the early morning hours of June 27, 2003, Brown and Congleton received dispatch over the radio that a robbery involving a weapon had been reported at the Circle K on Cottage Hill Road at Bel Air Boulevard. (Brown Depo. pp. 20-22, Congleton Depo. p. 24, Hammac Depo. p. 9). Before arriving at the location of the Circle K, Officer Brown and Congleton also heard a radio broadcast describing the suspect and reporting that the subject had told the clerk he was armed with a gun and that he had left the store on foot. (Brown Depo. p. 22, Congleton Depo. p. 24, Brooks Depo. p. 10).

Officer Congleton was the first to arrive on the scene. (Congleton Depo. p. 27). The store clerk informed Officer Congleton that an individual had entered the store, walked over to the beverage aisle, then asked the clerk to come over to him for a question. The man asked the clerk "do you have a gun?". The clerk said "no". The man then proceeded to reach into his waistband and said "I do, now give me all the money." (Congleton Depo. p. 28). At that point, the man forced the clerk into the store's cooler, then fled. (Congleton Depo. p. 29). When Brown arrived at the store, he was directed to several areas in the store where the clerk thought the subject may have touched surfaces, whereupon he attempted to lift fingerprints. (Brown Depo. p. 25). Officer Congleton obtained information from the clerk regarding the individual's physical description and the clothing he was wearing, then he broadcast the information over the radio. (Congleton Depo. pp. 32-33). Brown reports that he overheard the clerk tell another officer that

2

he thought he saw a gun in Byther's waistband; however, other testimony indicates that such a statement was not made. (Brown Depo. p. 94, Hammac Depo. p. 13, Congleton Depo. p. 17, Hines Depo. p. 10, Brooks Depo. p. 13). Shortly thereafter, Sergeant Enas Ready, the patrol officers' supervisor, and several other officers, located an automobile around the corner from the Circle K that contained items that matched those taken during the robbery. (Brooks Depo. p. 15). Found in the vehicle were a Cook's champagne bottle with condensation on it and clothing matching the robber's description in the back seat. (Congleton Depo. p. 35). Smith's Towing Company, the contract wrecker service for the city, was summoned to impound and tow away the vehicle. (Brooks Depo. p. 16, Brown Depo. p. 28). As Smith's Towing was preparing to remove the vehicle, the Smith's towing driver radioed his dispatcher that a subject was attempting to take the vehicle, whereupon Officer Congleton left the Circle K store and went to the location of the vehicle. Other officers returned to the scene. (Congleton Depo. pp. 56-57, Brooks Depo. p. 19). Upon arriving at the vehicle, the Smith's driver informed Officer Congleton that the subject came back to take his vehicle, and after being told he could not have it, ran north behind the Brown and Root building. (Congleton Depo. p. 58). Officer Congleton broadcasted this information to the other officers in the area, and they responded to that area. (Brown Depo. pp. 29- 30). The officers began looking for the subject. (Congleton Depo. p. 58). Officer Brown drove to the north end of the parking lot, got out of his car and conducted a brief search on foot of the wooded area by the television station. (Brown Depo. p. 30). Not locating the suspect, Officer Brown continued searching the parking lot area. He then went through a hedge and a gap in a fence and came out onto a street in a residential area behind the parking lot, where he met up with Officers Congleton and Brooks. (Brown Depo. pp. 44-45). Believing that

3

the subject had to be in the general area of Sage Avenue, Officer Congleton began patrolling that street when he saw a subject behind a house. (Congleton Depo. p. 59).  Officer Congleton ordered the suspect to "stop where he was at", whereupon the individual ran off to the back part of a house on Sage Avenue. (Congleton Depo. pp. 60-61, Brown Depo. p. 77).  Following the subject, Officer Congleton approached a privacy fence on the side yard following the subject, and Officer Brown ran around the front part of the house. (Congleton Depo. p. 62, Brown Depo. p. 77).  As Officer Congleton approached the backyard, he saw someone running behind the wooden fence through slats in the fence.  He opened the gate in the fence and confronted the subject, Carlos Byther, standing approximately two to three feet away from him. (Congleton Depo. p. 62).

The occurrences up to this point on the day of the incident are predominantly undisputed. However, the officers' statements regarding what took place when Congleton and Brown encountered Byther vary to some degree.  Because the extent and effect of these variances are at issue in this case, the court will discuss them in considerable detail.

Congleton's original narrative report described the incident as follows:

> I threw him to the ground.  As the subject was going to the ground his hands went to the inside of his waist band.  I repeated to the subject "let me see your hands" and he refused and I struck the subject several times to the back of the upper back and neck until he gave me his hands.  During the altercation the subject's head struck the ground and had a small injury to the head and medical was notified. After securing the subject the subject dropped several small blue bags containing a white powder substance believed to be cocaine.

(Congleton narrative report).  In a later statement, Congleton stated that he threw Byther down and he landed chest down with his left hand concealed, almost in a prone position with his right hand out.  (Congleton Statement p. 2).  Congleton was not sure when Brown came into control of

4

Byther's right hand, but knew Brown was holding the right hand when they got control of Byther and handcuffed him. (Congleton Statement p. 3). Brown delivered some kicks to Byther's head while Byther was down in the prone position. (Congleton Statement p. 3). As far as Congleton knew, Brown had control of Byther's right arm before blows were delivered to the back of Byther's head. (Congleton Statement p. 3). Congleton and Brown were both striking Byther at about the same time, and they both stopped when Congleton reached around the front of Byther and grabbed his left hand and Byther stopped resisting. (Congleton Statement pp. 4, 5). Congleton remembered Brown delivering about 3 or 5 blows to Byther's head. (Congleton Statement p. 4). Two of those times, Congleton remembers Byther's head hitting the concrete. (Congleton Statement p. 4).

Congleton testified at his deposition on February 24, 2005, that after he opened the gate, he grabbed Byther and Byther put his hand in his waistband, after which Congleton threw Byther to the ground. (Congleton Depo. pp. 65-67). Later in Congleton's deposition, he stated that from the moment he opened the gate until he threw Byther to the ground, Byther's left hand was in the general area of his waistband. (Congleton Depo. pp. 78-80). After throwing Byther to the ground, Congleton straddled Byther, sitting on his lower back or buttocks. (Congleton Depo. pp. 84-85, 89, 104-105, 149). Congleton repeatedly ordered Byther to show us his hands. (Congleton Depo. p. 84). According to Congleton, Brown did not give orders, only Congleton did. (Congleton Depo. p. 91). Congleton also stated that during the entire time that Byther was on the ground face down Congleton could see Byther's right hand and Officer Brown had control of it. (Congleton Depo. pp. 86-87). Congleton testified that Byther "struggled" with him, in that he refused to give him and Brown his hands, but he was not combative. (Congleton Depo. p.

5

88). Congleton was concerned that Byther may have access to a gun. (Congleton Depo. pp. 86-89). Congleton hit Byther three or four times with a closed fist in Byther's upper back, neck or head area. (Congleton Depo. pp. 89, 91-92). The incident happened so quickly, Congleton was not exactly sure what happened. (Congleton Depo. p. 93). Congleton was hitting Byther to get him to comply with their verbal commands to give Congleton his hand. (Congleton Depo. pp. 153-154). Byther's head hit the ground three or four times. (Congleton Depo. p. 95). Congleton testified that Brown used his foot to "stomp, like a downward motion" Byther in the head three or four times. (Congleton Depo. pp. 105-106, 163). Congleton did not hear Byther say anything during the incident. (Congleton Depo. pp. 163-164). After striking Byther three or four times, Congleton realized that what he was doing was not working and he reached around and grabbed Byther's left hand. (Congleton Depo. pp. 120, 165, 171). Congleton stated that, at the time of the incident, Congleton was 6' 3" tall and weighed 200 pounds and estimated that Byther was about 6' 3" and 210 pounds. (Congleton Depo. pp. 22-23). When Congleton first saw Byther, he believed Byther had a gun. (Congleton Depo. p. 73). Congleton testified that the whole incident happened within 15 to 20 seconds. (Congleton Depo. p. 78). Later in his deposition, Congleton stated that the incident occurred within about five to ten seconds. (Congleton Depo. p. 119).

Brown stated in his initial narrative report that the information he had been given was that the subject was believed to be armed with a gun. Brown described the incident as follows:

> Ofc Congleton attempted to grab the subject and ordered him onto the ground. The subject resisted and became combative and began frantically trying to get something from his pockets. Ofc Congleton and I were screaming repeatedly for the subject to show us his hands. I believed the subject to be armed based on the earlier information. We were able to briefly gain control of the subject and got him to his knees at which time he plunged his hands back into his waistband area. I began screaming again for him to give up his hands to which he refused. Believing him to be going for a weapon, I kicked the subject once in the head

with my right foot and continued ordering him to give me his hands. The subject
continued digging in his pockets/waistband, at which time I began forcing the
subject's head into the concrete driveway, ordering him to give up his hands. The
subject finally released his hands and at that time Ofc Congleton and I struggled
with him briefly to get him cuffed. We then discovered numerous blue zip-lock
"dime bags" used to package drugs which had come loose from the subject 's
clothing during the struggle.

In a later statement to Internal Affairs, Brown stated that he used his right foot and applied it to
the back of the subject's neck to force his head down into the concrete. (Brown Statement p. 18).
Brown struck Byther five or six times with his foot. (Brown Statement p. 28). Byther resisted,
he refused to produce his right arm. (Brown Statement p. 28). Brown was not sure when the
subject's chest went down on the concrete. (Brown Statement p. 19). Brown was not aware of a
lot of what Congleton was doing during the incident. (Brown Statement p. 20). Brown said the
subject finally threw his hand out, the blue bags came out, and that is when they were finally
able to gain control. (Brown Statement p. 20). Once Brown got hold of Byther's hand, Brown
stopped kicking him. (Brown Statement p. 25). Brown believes Byther sustained the injuries to
his face and head when they were trying to get control of Byther's right hand, when Brown
forced his head into the concrete. (Brown Statement pp. 21, 28).

In a second statement, Brown described the incident in more detail:

I approached [Congleton and Byther] from the front at approximately a 45 ° angle
on the subject's right side and attempted to gain control of his right arm. Ah,
Officer Congleton and I both then, ah, ordered the subject to get on the ground
and we tried taking him to the ground. I grabbed the subject, ah, by the clothing,
ah, in the area of, ah his right shoulder and pulled him forward. And, ah, in
pulling him forward I didn't maintain my grip on him. I lost control of him, let
him went down. The subject went down in to a partially upright position where
he was on his knees with, ah, one arm, his left arm down in front of him holding
himself up toward his chest. And his head was approximately 12 to 18 inches off
the ground. Ah, I ordered him, ah, several times to, give me his, his right hand
and he refused. I kept giving him that instruction; Officer Congleton was, was
screaming that instruction to him. Ah, from the position I was standing, which

7

was slightly in front of him and to the right and so I gained (unintelligible) by his head, his shoulder. I kicked the subject once, ah, with my right foot in the head on the face. Ah, my foot, a portion of my, my foot had struck him it was the top of my foot or my foot (unintelligible). Ah, at that point, or shortly thereafter, the subject, ah, dropped down closer to the ground on top of both of his arms. Ah, both of his arms are underneath him. Officer Congleton and I continued to, to instruct to-to give us his hands. Ah, at that point, or shortly thereafter, Officer Congleton began delivering strikes to the subject and I was able to gain control of his right arm. Ah, while Officer Congleton was-was punching or delivering strikes, ah, with a closed fist, I believe it was his right fist, to, ah , ah, the subject's back between his shoulder blades and, ah, the back of his head, ah screaming at him to-to give up his hand, his other hand, his left hand. Ah, I was trying to, ah, maintain control of his right arm and, ah, to instruct him to produce his other hand. Ah, the subject still had his hand underneath him and, ah, was refusing to produce it. Ah, I then, ah, ah, with-with my right foot, ah, exerted a force on the back of the subject's head, forcing his head down into the pavement to the point that it struck the, ah, concrete driveway, ah, there; and continued to, ah, to instruct him to give up his hands. Ah, the subject continued to, to keep his hand underneath him and was, appeared to be fumbling with something or-or trying to get something out from under him. And I continued to, ah, force his head, ah, into the concrete, ah, approximately 5 or 6 times. Ah, instruct him to, to give up his hands, ah, at-at that point the subject sort of sort of, ah, acquiesced. And, ah, Officer Congleton was able to pull his left arm out from underneath him and, ah, I maintained the, the subject's right arm slightly backward and extended.

(Brown Second Statement pp. 2-3).

At his deposition, which was taken on February 24, 2005, Brown testified that it was broadcast over the police radio that the suspect had told the store clerk he had a gun. (Brown Depo. p. 22). When Brown caught up to Congleton and Byther, he grabbed Byther's right arm and tried to pull it from under Byther's shirt away from his waistband area, but was unsuccessful. (Brown Depo. p. 85). At the time of the incident, Brown was approximately 5' 11" and about 150 pounds. (Brown Depo. p. 86). Brown estimates Byther was approximately 6 feet tall and 200 pounds. (Brown Depo. p. 86). Brown testified to the following:

Q. So after you made this attempt to get Mr. Byther's right hand from his waistband, what next occurred?
A. I didn't feel like we were going to accomplish anything standing up, so I started

8

pulling Mr. Byther forward trying to get him on the ground.

Q.  And what was Officer Congleton doing at that time"
A.  He was still on his right side.  I believe I said let's go to the ground and I started pulling him forward.  I believe Officer Congleton did the same.

Q.  And what happened at that point?
A.  We started taking Mr. Byther to the ground.

* * * *

Q.  So at that point what happens?
A.  I was able to get Mr. Byther partially to the ground.

Q.  Okay.  And when you say you got him partially to the ground, what do you mean?
A.  I mean instead of being able to get him flat on to his chest where I wanted him to be, he put down one of his hands - - I believe it was his left hand - - to stop him from going straight to the ground.

* * * *

Q.  Okay. Did you see [Officer Congleton take Mr. Byther to the ground in a prone position as he testified during his deposition]?
A.  I'm not sure I can - - I can answer that.  Because - - I was not standing to the side as a spectator, you know, when Officer Congleton, you know, that was described.  So I - - I'm not sure I can answer that the way it's been asked - - the way it's been phrased.

Q.  Did you see Officer Congleton throw Mr. Byther to the ground where he went to the ground in a prone position without him placing a knee or a hand down to brace himself from the fall, did you see ever see that personally?
A.  Did I see him go straight to the ground in a prone position without stopping himself?

Q. Yes, sir?
A.  No, sir.

Q.  Okay.  Now when - - as you described Mr. Byther goes down to the ground, is he on his knees and one hand?
A.  Yes, sir.

Q.  And the one hand is in his left hand?
A.  Yes, sir.

Q.  And the left hand is closest to Officer Congleton?
A. It was the side away from me.  I'm not - - I don't know exactly where Officer Congleton was at that point, his orientation of Mr. Byther.

9

Q.  You were on the right side of Mr. Byther
A . Right.

Q.  Was Officer Congleton at that time on his left side?
A.  He was either behind him or to his left side.  I don't - - I don't know exactly what Officer Congleton's position was when we were going to the ground.

Q. Okay.  Now, when Mr. Byther goes to the ground and he has his left hand out as you described, where is Mr. Byther's right hand?
A.  It's still in the area of his waistband underneath his shirt.

Q.  So, he has one hand at that time, his right hand in his waistband?
A. Yes, sir.

Q.  Has his left hand on the ground?
A.  Yes sir.

Q.   And he's on the ground with his knees?
A.  Yes, sir.  And this is in the span of a second or so, a second or two.

Q.  And Okay.  And did you at any time see Officer Congleton grab Mr. Byther's left hand?
A.  No, sir, not at that time.  At the end of the encounter, he grabbed his left hand and handcuffed.

Q. What was the - - after you saw Mr. Byther go down in the fashion that you described, what was the next thing that occurred?
A.  I ordered him down to the ground. I said that this was - - I mean from the time I grabbed hold of him to the position that I described him in now was incredibly fast, a couple seconds.  I ordered him to lay flat.  He didn't Like I say I was on his right side.  His hand was underneath his shirt in his waistband area.  All the information that I had at that point was that he was armed with a firearm in the waistband of his pants.  The next thing I did was from the position I was standing, I brought my right foot - - my right leg up in a sweeping motion and kicked Mr. Byther once in a sweeping motion and kicked Mr Byther once in the side of the face - - the head with my right foot.  I struck him with the portion - - the top portion of my boot where my ankle and my shin come together.

* * * *

Q. When you kicked him, how close was his face to the concrete.?
A. Maybe a foot.

Q. At that time did his head hit the concrete?
A.  No, sir.

10

Q.  After you kicked him in the face, did he continue to remain with one hand on the ground, his left hand, and his right hand in his waistband?
A.  No, sir.

Q.  Okay. Where was his right hand and his left hand at that point?
A.  At that - - again, this is - - I mean the entire incident or the entire sequence that you and I have just discussed was in a mater of a couple seconds.  So if you're asking immediately where were both of his hands, It's difficult for me to answer.  You know, I - - yeah, after he went down to the prone position, he went down to a prone position with his left hand underneath him and his right arm was actually at that point in a position where I could get ahold of it.

Q.  Okay. Where was his right arm at that point?
A.  When he went down to a prone position, like I said, his right arm relaxed to the extend that I was able to grab hold of it and get it away from his body.

Q.  And up to that point had you hit Mr. Byther anymore times other than that one kick?
A.  No sir.  That was the first - - my first physical contact with him was grabbing him and pulling him forward to the ground.  The kick was the first, if I understood your question correctly, that was the - - I'm sorry.  I've probably lost my train of thought. What specifically was your question?

Q.  Did you hit Mr. Byther in any fashion from the time that you kicked him in the face until the time that you grabbed hold of his right hand?
A.  In between the kick and me grabbing his arm, no, sir.

Q.  Where was Officer Congleton at the time you kicked Mr. Byther in the face?
A.  Specifically, I don't know exactly what his position was.

Q.  Was he on his back?
A.  No, sir, I don't believe yet.

Q.  Was he sitting on him?
A.  No, sir.

Q.  Did you see at that point in time Officer Congleton hitting Mr. Byther?
A.  At which point in time?

Q.  At the time that you have kicked him and he now goes into a prone position?
A. At that specific moment, and again, I mean this is - - I mean the time frame that you're asking about is probably less than a second.  So in that less than a second time frame between me grabbing his arm and him being in a prone position, no, sir, Officer Congleton was not yet doing anything that I'm aware of.

11

Q. Did you ever see Officer Congleton sitting on Mr. Byther?
A. Yes, sir.

Q. When is it that you first saw that?
A. Immediately after the - - the time frame we're discussing now.  After he went flat into a prone position, once he laid flat.

\* \* \* \*

(Brown Depo. pp. 86-100, 121-122).  Brown said he kicked Byther with enough force to cause Byther's face to firmly hit the pavement, and that he kicked Byther five or six times. (Brown Depo. p. 137).  Brown also testified that he had not seen anything in Byther's right hand and had not seen Byther throw anything or drop anything from his right hand. (Brown Depo. pp. 121-122).  Brown admitted at his deposition that in an earlier statement he had said that Byther "eventually pulled his hand out from his pants, threw it up in front of him and contained in his hand - - in his hand were numerous, I would say fifteen to twenty blue" "dime bags." (Brown Depo. pp. 122-123).  Brown thought he remembered that there were a number of empty baggies and four or five of them contained what appeared to be cocaine. (Brown Depo. p. 123).  Empty baggies were not catalogued or visible in any photographs taken of the evidence.

Defendant Officers Scott Congleton and Nelson Brown were members of the Mobile Police Department's Training Class #28 and received 736 hours of training.  Much of this concerned use of force. (City's Response To Interrogatory #11).  Officer Congleton testified that he was never given any instruction by the Mobile Police Department indicating that it was ever appropriate to kick a suspect in the head or concerning when it was appropriate to strike a suspect in the head.  (Congleton Depo. p. 20).

The plaintiff's police procedures expert, Donald Perry Van Blaricom, testified that he had no criticisms of the training provided to the City of Mobile Police Officers.  Furthermore, he testified that

12

he had no criticism or complaints about the way the City of Mobile conducted its Internal Affairs

Investigation, only with the conclusion reached by that investigation. (Van Blaricom Depo.

pp.198-199).

## **LEGAL ANALYSIS**

### **A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56©) provides that summary judgment shall be granted: "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."   The trial court's function is not "to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).   "The mere existence of some evidence to support the non-

moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284

F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250.

(internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  See Anderson, 477 U.S. at 251-252.  The moving party bears

the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d

1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all

evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about

the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999).  "If

reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny

13

summary judgment." <u>Miranda v. B&B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing <u>Mercantile Bank & Trust v. Fidelity & Deposit Co.</u>, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56©), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 524 (11th Cir.1994)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Claims against Officers Goff, Brooks, Hines and Hammac**

Plaintiff concedes that summary judgment is due to be granted as to defendant officers, Goff, Brooks, Hines, and Hammac.  Accordingly, the court will grant summary judgment in their favor.

**C. Claims against the City of Mobile**

Plaintiff only opposes the City's motion for summary judgment as to plaintiff's state law claims.  Thus, summary judgment is due to be granted in favor of the City of Mobile on plaintiff's federal claims.

Under Alabama law, the liability of a municipality is limited to injuries suffered through "neglect, carelessness or unskillfulness." ALA. CODE § 11-47-190; Franklin v. City of Huntsville, 670 So.2d 848, 852 (Ala. 1995). A municipality can be held liable "where the officer committing the alleged assault or battery was unskilled as a consequence of inadequate training or supervision of the municipality." Nolin v. Town of Springville, 45 F.Supp.2d 894, 914 (N.D. Ala. 1999), reversed on other grounds, 207 F.3d 1253 (11th Cir. 2000). The City contends that there is no evidence that the actions of officers Congleton and Brown were the result of unskillfullness caused by inadequate training or supervision. Officer Congleton testified that he was never given any instruction by the Mobile Police Department indicating that it was ever appropriate to kick a suspect in the head or concerning when it was appropriate to strike a suspect in the head. However, the court finds that Congleton's statement does not demonstrate insufficient training or supervision. Plaintiff's police procedures expert testified that he had no criticisms of the training provided to the City of Mobile Police Officers.

Plaintiff cites cases where courts have allowed assault claims against municipalities to go forward. However, most of those cases involved motions to dismiss in which only the four corners of the complaint are considered. See e.g. Hawkins v. City of Greenville, 101 F.Supp.2d 1356, 1365 (M.D. Ala. 2000)(motion to dismiss); Campbell v. Sims, 686 So.2d 1227, 1229 (Ala.Civ.App. 1996) (motion to dismiss); Franklin v. City of Huntsville, 670 So.2d 848, 852 (Ala.1995)(motion to dismiss); Borders v. City of Huntsville, 875 So.2d 1168 (Ala. 2003) (motion to dismiss). The issue in those cases was whether facts could be developed to support plaintiff's claims. While City of Birmingham v. Thompson did not address a motion to dismiss, it merely stated that an assault claim can be based on unskillfulness. 404 So.2d 589, 592 (Ala. 1981) (addressing adequacy of jury charges). None of the cases support plaintiff's contention that the evidence against the City submitted in this case is sufficient to survive summary judgment. Although the allegations in Plaintiff's complaint may be sufficient to survive a motion to dismiss, discovery is closed and any supporting facts should have been developed. The court finds the evidence of unskillfulness insufficient to survive summary judgment.

15

In addition, as will be discussed in more detail below, under Alabama law, Officers Congleton and Brown are entitled to discretionary function immunity.  ALA. CODE. § 6-5-338(a) (1975).  Pursuant to Alabama Code § 6-5-338(b), this immunity is extended to the City of Mobile. City of Crossville v. Haynes, ____ So. 2d ____, 2005 WL 1926435, *11 (Ala. Aug. 12, 2005) (citation omitted);  Stovall v. Allums, 2005 WL 2002069, *11 (M.D. Ala. Aug. 16, 2005) (citations omitted).

### D. Claims against Congleton and Brown

Plaintiff asserts the following claims against Congleton and Brown in their individual and official capacities:  (1) a § 1983 claim for the officer's use of excessive force, (2) assault and battery, (3) negligence, (4) intentional infliction of emotional distress.

#### 1. § 1983, Excessive Force

##### a. Against the officers in their official capacity

When an officer is sued under § 1983 in his official capacity, the suit is simply "another way of pleading an action against an entity of which an officer is an agent." Busby v. City of Orlando, 931 F.2d 764, 776 (11ᵗʰ Cir. 1991) (quoting Kentucky v. Graham, 473 U.S. 159,  165, 105 S.Ct. 3099, 3105 , 87 L.Ed.2d 114 (1985)[internal quotations omitted]).

> Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents. See [Kentucky,] 473 U.S. at 165-66, 105 S.Ct. at 3105; Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985); Monell [v. Dept. of Social Services of City of New York], 436 U.S. [658] at 691 [(U.S.N.Y. 1978)], 98 S.Ct. [2018] at 2036 [(1978)]; Farred v. Hicks, 915 F.2d 1530, 1532 (11th Cir.1990).  Consequently, a plaintiff cannot rely on a respondeat superior theory to hold a municipality liable for individual actions of its officers. Monell, 436 U.S. at 691, 98 S.Ct. at 2036; Hearn v. City of Gainesville, 688 F.2d 1328, 1334 (11th Cir.1982).  "[A] municipality cannot be held liable solely because it employs a tortfeasor." Monell, 436 U.S. at 691, 98 S.Ct. at 2036 (emphasis in original).  Instead, in order to recover against a municipality, a plaintiff must establish that the alleged racial discrimination or harassment occurred pursuant to a custom or policy of the municipality. Id. at 694, 98 S.Ct. at 2037; Gilmere v. City of Atlanta, 774 F.2d 1495, 1503 (11th Cir.1985), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); Hearn, 688 F.2d at 1334.
>
> Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to

bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond).  See Kentucky v. Graham, 473 U.S. at 166, 105 S.Ct. at 3105; Brandon v. Holt, 469 U.S. at 471-72, 105 S.Ct. at 877-78. ...

Busby, 931 F.2d at 776.  Based on the above, the court finds that summary judgment is due to be granted as to claims brought against Officers Nelson and Bowden in their official capacities.

### b. Against the officers in their individual capacity

Defendants assert that they are entitled to qualified immunity as to plaintiff's claim of excessive force.   "Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks omitted).  Here, it is clear that Officers Congleton and Brown were acting within the course and scope of their discretionary authority in responding to the dispatched report of an armed robbery, apprehending the suspect, and arresting the suspect.  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

In considering the merits of a qualified immunity defense in excessive force cases, courts previously considered whether the right was clearly established and, if so, whether, in light of such clearly established law, a reasonable officer could have known that his/her conduct was unlawful. See Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001) (citing Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and Anderson v. Creighton, 483 U.S.

635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  However, the Supreme Court revisited the above

analysis, clarifying the sequence of inquiries for qualified immunity cases. Id.

The Supreme Court held in Saucier that a qualified immunity analysis must begin with the

threshold determination of whether, based upon the facts taken in the light most favorable to the party

asserting the injury, the officer's conduct violates a constitutional right. Id. at 201; Hope v. Pelzer, 536

U.S. 730, 122 S.Ct. 2508 (2002).  If no constitutional right was violated, the court need not inquire

further. Id.  If, however, a constitutional violation occurred, the court must then determine whether the

right was clearly established. Id.

In considering the first step of Saucier's two-step qualified immunity inquiry, we must

determine whether plaintiff's constitutional right to be free from excessive force was violated  Under

the Fourth Amendment, officers may only use such force as is "objectively reasonable" under the

circumstances. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  The

court, in making this determination, must presume that the plaintiff's version of events is true.  See

Hope, 536 U.S. at 736 (The threshold inquiry is "whether plaintiff's allegations, if true, establish a

constitutional violation." emphasis added).  The Supreme Court described the "objectively reasonable"

standard to be applied in such excessive force cases as follows:

> Determining whether the force used to effect a particular seizure is "reasonable"
> under the Fourth Amendment requires a careful balancing of " 'the nature and quality of
> the intrusion on the individual's Fourth Amendment interests' " against the
> countervailing governmental interests at stake. Id., at 8, 105 S.Ct., at 1699, quoting
> United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).
> Our Fourth Amendment jurisprudence has long recognized that the right to make an
> arrest or investigatory stop necessarily carries with it the right to use some degree of
> physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S.[1], at 22-27
> [(U.S. Ohio 1968)], 88 S.Ct. [1868], at 1880-1883 [(1968)].  Because "[t]he test of
> reasonableness under the Fourth Amendment is not capable of precise definition or
> mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60
> L.Ed.2d 447 (1979), however, its proper application requires careful attention to the
> facts and circumstances of each particular case, including the severity of the crime at
> issue, whether the suspect poses an immediate threat to the safety of the officers or
> others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
> See Tennessee v. Garner, 471 U.S. [1], at 8-9 [(1985)], 105 S.Ct.[1694], at 1699-1700
> [(1985)] (the question is "whether the totality of the circumstances justifie[s] a particular
> sort of ... seizure").

> The "reasonableness" of a particular use of force must be judged from the

18

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, 392 U.S., at 20-22, 88 S.Ct., at 1879-1881. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d [1028], at 1033 [(2d Cir. 1973)], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978); see also Terry v. Ohio, supra, 392 U.S., at 21, 88 S.Ct., at 1879 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Scott v. United States, supra, 436 U.S., at 138, 98 S.Ct., at 1723, citing United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

Graham, 490 U.S. at 396-397, 109 S.Ct. at 1871-1872. "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand" Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir.2002) (internal quotation marks omitted). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205.

If the court determines that defendants violated plaintiff's Fourth Amendment rights, the court must then turn to the second step in the analysis, whether those rights were clearly established. Even if the court were to hold that the officers violated the Fourth Amendment, the officers are still entitled to immunity if their actions resulted from reasonable mistakes as to the legality of their actions. Id. at 206. "[T]he law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). A plaintiff can establish that the state of the law

19

provided clear notice or warning to the officers that the conduct was unconstitutional by submitting fact-specific precedents, or demonstrating that the very conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent." Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting Lee, 284 F.3d at 1199).

According to plaintiff, the officers unnecessarily used deadly force against Byther because he was unarmed, was not combative, and did not resist arrest. Plaintiff has not offered his own version of the facts, but contends that because of the variances in the officers' statements and testimony the officers should not be believed. The court disagrees. After a thorough review of the officers' statements and testimony, the court finds that the differences result primarily from the officers' different perceptions during an intense encounter that happened in a matter of seconds. Plaintiff's own expert testified that when officers have to engage in the use of force or in a struggle, they may not remember everything accurately. (Blaricom Depo. pp. 218-220). The officers are so focused on survival that everything else is excluded. Id. The court also notes that the officers' depositions were taken more than a year and a half after the event, while their original narratives were written the same day as the event. It is natural for the officers' memory and understanding of their exact movements and actions and the actions of others during the quick event to change somewhat upon reflection and the passage of time. Moreover, the officers' statements and testimony are consistent as to the most important facts.

As the Graham Court stated, factors to consider when determining whether excessive force was used include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. at 1871. In this case, there is no dispute that the crime which Byther had reportedly committed was armed robbery, a very serious crime. Because Byther was believed to be armed with a gun, he clearly posed an immediate threat to the safety of the officers and others in the area. Although plaintiff disputes that Byther was armed, there is no dispute that Byther told the store clerk that he had a gun and that this information was reported to the officers. Although

Byther reportedly did not display a gun during the robbery, that does not diminish the fact that the officers believed Byther had committed armed robbery and was likely to be armed when they encountered him. Plaintiff points to differences in testimony as to whether Brown overheard the clerk tell another officer that he thought he saw a gun in Byther's waistband; however, regardless whether Brown heard or misheard such a statement, the facts as reported by all witnesses demonstrate that Byther reported he had a gun and the officers considered Byther to be armed. The testimony also varies slightly as to the extent Congleton could see Byther's hands (and whether they had anything in them) when he encountered Byther. However, even if Congleton had full view of Byther's hands and sufficient time to consider the fact that no gun was visible before reacting, Byther was reportedly carrying the gun in his waistband and, thus, the gun could still be hidden from view. Plaintiff appears to put much emphasis on Congleton's varying accounts of exactly when Byther put his hand in his waistband. However, the entire struggle took less than half a minute and the differences in testimony are slight. Moreover, the court finds it immaterial whether Byther's hand was already in his waistband or whether he reached for his waistband upon Congleton confronting him. The evidence also shows that Byther had  attempted to evade arrest by flight and suggests that he actively resisted arrest upon being confronted by the officers. Byther had clearly fled the scene and run from the officers. Although Byther never "fought" with the officers in that he did not attempt to hit or strike them in any way, the evidence clearly demonstrates that he would not give the officers his hands upon repeatedly being ordered to do so and that he struggled with the officers.

Plaintiff cites <u>Tennessee v. Garner</u>, to support the contention that the force used was excessive. 471 U.S. 1, 105 S.Ct. 1694 (1985). In <u>Garner</u>, the Supreme Court stated the following:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

<u>Garner</u>, 471 U.S. 1, 11-12, 105 S.Ct. 1694,1701 (1985). Clearly, the crime of armed robbery

constitutes a crime involving "threatened infliction of serious physical harm.  Thus, even if the officer's action constituted "deadly force" such force is not unconstitutionally unreasonable to prevent escape of a suspect, such as Byther, who was believed to have committed armed robbery.  Garner states that some warning should be given where feasible, but the evidence demonstrates that Byther was aware the officers were pursuing him, Congleton had ordered Byther to stop.  More importantly, there is no indication that the officers intended to use deadly force prior to beginning their struggle with Byther.  Neither officer had his gun drawn.  Congleton grabbed Byther and attempted to gain control of Byther.  If Byther had submitted, giving the officers his hands, no additional force would have been necessary for the officers to gain control of the suspect.  It was not reasonably feasible to give Byther any warning under the circumstances of this case.  As the Graham court stated "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S.Ct. at 1872.  Thus, the court finds that the officers did not violate Byther's constitutional rights.

Even if Byther's constitutional rights had been violated, the court finds that it was not readily apparent that the officers' conduct was unlawful and, therefore, their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  The cases cited by plaintiff are not analogous.  For instance in Smith v. Mattox, the court found that an officer was not entitled to qualified immunity in "a very close case" where the officer deliberately broke a subdued suspect's arm while in the process of handcuffing him. Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).  The plaintiff in Smith had "docilely submitted to arrest" by getting down on the ground in compliance with the officer's instructions. Id. at 1418.  In this case, it is evident that plaintiff did not comply with the officers' orders and resisted arrest.  Thus, Officers Congleton and Brown are entitled to qualified immunity, and summary judgment is due to be granted in favor of officers Congleton and Brown as to plaintiff's § 1983 claim.

**2. State law claims**

22

Under Alabama law, municipal police officers are afforded "immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." ALA. CODE § 6-5-338 (1975). "Alabama law has defined discretionary acts as [t]hose acts [as to which] there is no hard and fast rule as to course of conduct that one must or must not take and those requiring exercise in judgment and choice and [involving] what is just and proper under the circumstances. Montgomery v. City of Montgomery, 732 So.2d 305, 310 -311 (Ala.Civ.App. 1999) (citations and internal quotations omitted). Officers Congleton and Brown were clearly engaged in a discretionary function within the line and scop of their law enforcement duties. See Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). ("Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby."). Since the officers' conduct constituted discretionary acts within the line and scope of their duties, the officers are entitled to discretionary immunity unless the plaintiff can demonstrate that the officers' conduct "is so egregious as to amount to malicious conduct or conduct engaged in bad faith." Couch v. City of Sheffield, 708 So.2d 144, 153 (Ala. 1998) (citation omitted). There is no evidence that Officers Congleton or Brown acted in bad faith or maliciously. Therefore, the court finds that Officers Congleton and Brown are entitled to discretionary immunity under ALA. CODE. § 6-5-338. Thus, summary judgment is due to be granted in favor of Officers Congleton and Brown as to plaintiff's state law claims.

## **CONCLUSION**

For the reasons stated above, summary judgment is hereby **GRANTED** in favor of all defendants on all claims.

**DONE** and **ORDERED** this 9th day of November, 2005.


  /s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE